UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GERALD ANTHONY HAYES                          CIVIL ACTION

VERSUS                                        NO. 14-129

CAROLYN W. COLVIN, ACTING                     SECTION "J" (2)
 COMMISSIONER OF SOCIAL SECURITY

## FINDINGS AND RECOMMENDATION

Plaintiff, Gerald Anthony Hayes, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Act.  42 U.S.C. §§ 423, 1382c.  This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

I.    PROCEDURAL HISTORY

Hayes filed his applications for DIB and SSI on September 1, 2011, alleging disability beginning December 15, 2010, due to pins in his right leg, asthma, high blood pressure, diabetes, arthritis in his hands and legs, and surgery on his left leg.  (Tr. 113-26, 170).  After his claims were denied at the agency level, he requested a hearing before an Administrative Law Judge (ALJ), which was held on September 5, 2012.  The ALJ issued a decision denying the application for benefits on October 26, 2012.  (Tr. 14-22).  After the Appeals Council denied plaintiff's request for review on November 15, 2013,

the ALJ's decision became the Commissioner's final decision for purposes of this court's review.  (Tr. 1-3).

Plaintiff filed a timely memorandum of facts and law.  Record Doc. No. 12. Defendant filed a timely reply memorandum.  Record Doc. No. 13.

II.    STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.    Substantial evidence does not support the ALJ's residual functional capacity finding.

B.    The ALJ failed to consider Medical-Vocational Guideline 201.10.

III.    ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

1.    Hayes meets the insured status requirements for DIB through June 30, 2012.

2.    He has severe impairments consisting of pins in the right leg, asthma, high blood pressure, diabetes, arthritis in hands and legs, and status post surgery on left leg.

3.    He has the residual functional capacity to perform light work, except he can lift/carry 20 pounds maximum and 10 pounds frequently; walk/stand six hours in an eight-hour day in increments of 30 minutes at a time; sit up to six-plus hours in an eight-hour day in increments of 45 to 60 minutes at a time; needs to be able to change positions after the times indicated; can stoop occasionally; can grasp, turn and hold; can use his fingers for precise work; has difficulty completing work tasks in a normal work day at a consistent pace; has difficulty maintaining attention and concentration for extended periods; should avoid dust/fumes/gases; and cannot climb stairs.

4.    Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  However, his statements concerning the intensity, persistence and limiting effects of these symptoms

2

are not entirely credible to the extent they are inconsistent with the above residual functional capacity assessment.

5.    Hayes cannot return to his past relevant work as a brick mason and cement mason, which was heavy, skilled work.

6.    Plaintiff was 51 years old and closely approaching advanced age on the alleged disability onset date.  He has a limited education and is able to communicate in English.

7.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Guidelines as a framework supports a finding that Hayes is not disabled, whether or not he has transferable job skills.

8.    Considering his age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Hayes can perform, such as information clerk and general office clerk.

9.    Plaintiff has not been under a disability from December 15, 2010, the alleged onset date, through the date of the decision.

(Tr. 15-20).

IV.    ANALYSIS

A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir.

2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)).   Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363-64; Perez, 415 F.3d at 461.  This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision.  Halterman ex rel. Halterman v. Colvin, No. 12-31099, 2013 WL 5913945, at *2 (5th Cir. May 9, 2013) (citing Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364.   The Commissioner, rather than the courts, must resolve conflicts in the evidence. Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez, 415 F.3d at 461).  Any findings of fact by the Commissioner that are

supported by substantial evidence are conclusive.  Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for SSI or DIB,[1] plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2012).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.[2]  Id. §§ 404.1520, 416.920;

---

[1]The relevant law and regulations governing claims for DIB and SSI are identical.  Carmon v. Barnhart, 81 F. App'x 410, 411 n.1 (3d Cir. 2003) (citing Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994)); Baltierra v. Chater, 70 F.3d 1268, 1995 WL 696740, at *1 (5th Cir. Oct. 19, 1995) (citing Haywood v. Sullivan, 888 F.2d 1463, 1467 (5th Cir. 1989)); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *1 (5th Cir. Apr. 5, 2001) (citing Haywood, 888 F.2d at 1467).

[2]The five-step analysis requires consideration of the following:
First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).
Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).
Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).
Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

5

Alexander v. Astrue, 412 F. App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue, 501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461. The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Id.

The claimant has the burden of proof under the first four parts of the inquiry. If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'" Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

---

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

B.    <u>Factual Background</u>

Hayes testified that he was 53 years old, had completed the seventh grade and can read, write and do simple arithmetic.  (Tr. 29).  He said he used to have a driver's license, but he stopped driving and let his license expire because he gets dizzy when he takes his medicine and his hands lock up.  He stated that he worked as a brick mason and also poured and finished concrete along with that job.  (Tr. 30).  He testified that he stopped working in December 2010.

Plaintiff said he has high blood pressure, diabetes, asthma, arthritis and gout.  He stated that his doctors told him to avoid the sun.  He testified that he has arthritis in his hands, ankles and feet, and gout in both of his feet and hands.

Hayes stated that he was in motor vehicle accidents in August 2011 and January 2012.  (Tr. 31).  He said that he had surgery on his left ankle after the first accident and that both his ankles swell.  He testified that he never had recommended surgery on his left ankle to remove the screws because he was told that Medicaid would not pay for it. (Tr. 32).

Plaintiff stated that the second accident occurred when he was a passenger in a vehicle.  He said that a truck ran a red light, hit his vehicle and flipped it over.  He said he woke up in the hospital.  He stated that his right knee, neck and back were injured and he has a ruptured disk in his back.

7

Hayes said he has been treated at Tulane Medical Center and Tulane Covenant House. He stated that his medications make him drowsy. He testified that he uses a cane because his back or knees sometimes give out when he is walking.

Plaintiff said he typically stays close to the house, does not go too far, takes his medicine and sleeps because his feet swell and he has to keep them elevated. (Tr. 33). He stated that his son helps him clean and takes care of the yard. He said he keeps a bucket next to his bed because sometimes he cannot make it to the bathroom.

Hayes testified that he likes hunting, fishing, bowling and playing basketball, but cannot do any of these activities anymore. He said he can walk for about two blocks before his feet hurt badly and he has to stop. He stated that his daily activity level depends on which medicine he takes, but that he cannot do anything if he takes one Percocet. He said he can stand for about 30 minutes on a good day before he feels it in his knees, back and feet. (Tr. 34). He testified that he can only go up three to four steps because of pressure on his ankles and back. When asked about his ability to sit, he said he was starting to cramp up at the hearing. He stated that he can only sit for about 45 minutes.

Plaintiff testified that he elevates his legs every day as long as he is lying down. He said he sometimes lies down all day when he takes his medicine because it makes him drowsy and tired. (Tr. 35). He asked if he could stand up during the hearing because his leg was cramping. (Tr. 37).

8

C.    <u>Vocational Expert Testimony</u>

A vocational expert, Mary C. Elvir, testified at the hearing that Hayes worked as a brick mason and a cement mason, which are heavy, skilled jobs.  She stated that, if he was limited to light work, he could not return to his past relevant work.

The ALJ posed a hypothetical of a person who can lift and carry a maximum of 20 pounds and 10 pounds frequently; walk and stand for six hours in an eight-hour day in increments of 30 minutes at a time; sit for six or more hours in an eight-hour day in increments of 45 to 60 minutes at a time; must be able to change positions after the times indicated; can stoop occasionally; can grasp, turn and hold; can use his fingers for precise work; cannot climb stairs; and is precluded from jobs with more than occasional exposure to dust, fumes and gases.  (Tr. 36-37).  Elvir testified that such an individual could not perform plaintiff's past relevant work.

The ALJ noted that Hayes testified that he only went to the seventh grade, but other records indicate he went to ninth grade.  The ALJ modified the hypothetical to add that the person has a limited education and is closely approaching advanced age.  The vocational expert testified that this person could perform unskilled jobs available in the Louisiana and national economies, such as information clerk and general office clerk. (Tr. 37-38).

The ALJ posed a third hypothetical with the additional restriction that, due to pain or the side effects of medications, the individual has slight to moderate limitations in

9

maintaining attention and concentration for extended periods and completing work tasks in a normal work day at a consistent pace.  The ALJ defined "moderate" as having an adverse impact on the person's ability to perform at optimal level for up to one-third of the work day, but at no time would work be entirely precluded.  Elvir testified that this hypothetical person could still perform the two jobs she had identified.  (Tr. 38).

Upon questioning by plaintiff's attorney, Elvir stated that both jobs she had named are within the light exertional level.  Plaintiff's attorney modified the ALJ's hypothetical to add that the person needs to lie down more than one hour per work day due to the side effects of medication.  The vocational expert testified that such an individual could not perform any work.

Plaintiff's attorney modified the ALJ's second hypothetical so that the person's attention problems due to pain are moderate to severe, with "severe" meaning the frequent inability to concentrate on job tasks.  Elvir stated that such a person could not perform any work.  (Tr. 39).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 17-19).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.   <u>Plaintiff's Appeal</u>

   1.   Substantial evidence supports the ALJ's residual functional capacity
       <u>findings.</u>

Before deciding at the fourth step of the sequential evaluation whether a claimant can return to his past relevant work, the ALJ must determine the claimant's residual functional capacity.  Residual functional capacity "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record." <u>Perez</u>, 415 F.3d at 461-62 (citing 20 C.F.R. § 404.1545(a)(1)); <u>accord</u> <u>Giles v. Astrue</u>, 433 F. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(e), 404.1545).  The ALJ is solely responsible for assessing the medical evidence and determining the claimant's residual functional capacity.  <u>Taylor v. Astrue</u>, 706 F.3d 600, 602-03 (5th Cir. 2012); <u>Joseph-Jack v. Barnhart</u>, 80 F. App'x 317, 318 (5th Cir. 2003); <u>Perez v. Heckler</u>, 777 F.2d 298, 302 (5th Cir. 1985).

The ALJ in the instant case found that Hayes has the residual functional capacity to perform light work with the limitations described in the ALJ's decision.  Because Hayes carried his burden to show at the fourth step that he cannot return to his past relevant work, "the 'burden shifts to the Commissioner on the fifth step to show that the claimant can perform other substantial work in the national economy.  Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut this

11

finding.'" <u>Bayer v. Colvin</u>, 557 F. App'x 280, 286 (5th Cir. 2014) (quoting <u>Perez</u>, 415 F.3d at 461).

At the fifth step, the ALJ held that Hayes is capable of performing jobs such as information clerk and general office clerk. Plaintiff argues that the ALJ erred by failing to include in his residual functional capacity his alleged limitations in sitting, standing and walking, and his need to lie down for much of the day because of pain associated with his ankle surgery and arthritis. He contends that he cannot perform light work because of arthritis in both hands and both legs. Relying on his own testimony, which he alleges is credible and supported by the medical evidence, Hayes argues that he is capable of less than the full range of sedentary work. A finding that he is limited to sedentary work would benefit him because Medical-Vocational Guideline 201.10 directs a finding of disabled for a person with his age, education and work experience who can only perform sedentary jobs.

Substantial evidence supports the ALJ's residual functional capacity findings. The ALJ's summary of the medical evidence was thorough and accurate. Plaintiff's argument regarding limitations caused by his pain and other symptoms relies almost entirely on his own testimony. As the ALJ stated, the record as a whole does not substantially support all of the subjective complaints and functional limitations that Hayes alleges are caused by his medical impairments.

"While pain can be disabling, it is not an automatic ground for entitlement to disability benefits.  Pain is recognized as a disabling condition under the Act only where it is constant, unremitting, and wholly unresponsive to therapeutic treatment.  The test for disability under the Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort."  Alvarez v. Colvin, No. 3:12-CV-03569-BK, 2013 WL 1858197, at *7 (N.D. Tex. May 3, 2013) (citing Hames v. Heckler, 707 F.2d 162, 166 (5th Cir. 1983)); accord Nugent v. Astrue, 278 F. App'x 423, 427 (5th Cir. 2008) (citing Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985)); Beck v. Barnhart, 205 F. App'x 207, 212 (5th Cir. 2006) (citing Cook, 750 F.2d at 395); Selders, 914 F.2d at 618.

It is within the ALJ's discretion to determine the disabling nature of a claimant's pain, and the ALJ's determination is entitled to considerable deference.  Jenkins v. Astrue, 250 F. App'x 645, 647 (5th Cir. 2007) (citing Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001)).  Whether a claimant is able to work despite some pain is within the province of the ALJ, and the determination should be upheld if supported by substantial evidence.  Id. (citing Chambliss, 269 F.3d at 522; Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)).

The ALJ acknowledged that Hayes has severe impairments consisting of pins in his right leg, asthma, high blood pressure, diabetes, arthritis in hands and legs, and status post surgery on his left leg.  However, "'[t]he mere presence of some impairment is not disabling per se.  Plaintiff must show that [he] was so functionally impaired . . . that [he]

13

was precluded from engaging in any substantial gainful activity.'"  <u>Bordelon v. Astrue</u>, 281 F. App'x 418, 422 (5th Cir. 2008) (quoting <u>Hames</u>, 707 F.2d at 165) (emphasis added); <u>accord</u> <u>Anthony v. Sullivan</u>, 954 F.2d 289, 293 (5th Cir. 1992).

Subjective complaints of pain or other symptoms must be corroborated by objective medical evidence.  <u>Quijas v. Astrue</u>, 298 F. App'x 391, 393 (5th Cir. 2008) (citing <u>Chambliss</u>, 269 F.3d at 522).  Subjective complaints may be discounted when the alleged symptoms are not consistent with the objective evidence.  <u>Brown v. Astrue</u>, 344 F. App'x 16, 21 (5th Cir. 2009); <u>Hernandez</u>, 278 F. App'x at 340; <u>Dunbar v. Barnhart</u>, 330 F.3d 670, 672 (5th Cir. 2003).

Determining the credibility of plaintiff's subjective evidence of pain and disability is a necessary part of the ALJ's consideration of the evidence.  <u>Luckey</u>, 458 F. App'x at 326 (citing <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir. 1985)); <u>Perez</u>, 415 F.3d at 462. The ALJ is bound to explain his reasons for rejecting a claimant's subjective complaints, but "is not required to 'follow formalistic rules in his articulation.'"  <u>Hernandez v. Astrue</u>, 278 F. App'x 333, 339 (5th Cir. 2008) (quoting <u>Falco</u>, 27 F.3d at 164).  The ALJ has the responsibility to evaluate the credibility of witnesses, <u>Masterson v. Barnhart</u>, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'"  <u>Spruill v. Astrue</u>, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting <u>Falco</u>, 27 F.3d at 164).  Thus, the ALJ's credibility evaluation is entitled to <u>considerable deference</u> by this court.  <u>McKnight v. Astrue</u>, 340

14

F. App'x 176, 181 (5th Cir. 2009) (citing <u>Newton</u>, 209 F.3d at 459); <u>Bedford v. Astrue</u>, 236 F. App'x 957, 962 (5th Cir. 2007) (citing <u>Newton</u>, 209 F.3d at 459).  The ALJ is required only to review the entire record, resolve conflicts in the evidence and state specific reasons for his credibility findings, supported by the evidence.  <u>Luckey</u>, 458 F. App'x at 324; <u>Giles v. Astrue</u>, 433 F. App'x 241, 249 (5th Cir. 2011).

The ALJ explained why he found that Hayes's subjective symptoms and alleged limitations were not entirely credible and were inconsistent with the evidence as a whole. (Tr. 18).  The ALJ incorporated into his residual functional capacity assessment all the functional limitations he found credible.  Plaintiff's testimony is insufficient to establish any additional limitations.  His testimony that he suffers severe pain and medication side effects, including needing to keep his legs elevated and lie down for much of the day, are not substantially supported by the medical evidence.

According to the medical evidence, Hayes reported that he had surgery on his right ankle either in 2002 (Tr. 420), or seven to eight years before (Tr. 255) he fractured his left ankle on August 19, 2011.  Whatever the correct date, he worked for many years after his right leg surgery.  There is no medical evidence that the right leg did not heal or that he suffered any negative residual effects from that surgery.  Although plaintiff's alleged onset date is December 15, 2010, and he testified that he stopped working in December 2010, nothing in the medical records supports a medical need to do so at that time. During 2010, plaintiff sought treatment from his primary care physician, Gurmukh Bawa,

M.D., only on September 2 for a check-up and a swollen right ankle, and on September 30 for medication refills and complaints of headaches. (Tr. 372-75). Hayes did not seek treatment again until April 13, 2011.

Plaintiff was treated for high blood pressure, asthma, arthritis and chest pain for many years by Dr. Bawa (Tr. 368-77), and later at Tulane Medical Center by clinician Michele Simoneaux.[3] Hayes took prescription medicines for these conditions through August 13, 2012, the date of the last medical report in the record, without any documented side effects. (Tr. 407, 411-12).

On April 13, 2011, Dr. Bawa noted that plaintiff has diabetes, but he did not prescribe any medication for the disease. (Tr. 376). Hayes reported to Dr. Simoneaux at his first visit on January 23, 2012, that he had been diagnosed with diabetes five years earlier. She noted that no medication was necessary. (Tr. 421). Other than plaintiff's report during an unrelated emergency room visit on November 24, 2011, that he took metformin,[4] no medical evidence indicates that he ever took any medication for diabetes.

---

[3]Tulane Medical Center notes from 2012 refer to a "clinician" or "examiner," without indicating whether the provider is a medical doctor. I have assumed that Simoneaux is a medical doctor.

[4]Glipizide/metformin is used to help control blood sugar in adults with type 2 diabetes. Glipizide helps the body release more insulin. Metformin helps the body respond better to the insulin it makes naturally, decreasing the amount of sugar made by the liver and the amount of sugar that the intestines absorb. PDRhealth (PDR Network, LLC), http://www.pdrhealth.com/drugs/glipizide-metformin (visited Sept. 26, 2014).

Hayes suffered a trimalleolar fracture[5] of his left ankle on August 19, 2011. Orthopedist Ramon F. Rodriguez, M.D., of Tulane Medical Center performed an open reduction and internal fixation (surgical repair) with syndesmotic[6] screw placement ten days later and Hayes was placed into a short leg cast. He was advised to elevate his left leg, use ice, use crutches and bear no weight on the leg. He received a prescription for Percocet.[7] (Tr. 239, 247). At followup visits on September 13 and October 3, 2011, he was doing well, with some soft tissue swelling. His cast was replaced and Percocet was prescribed. (Tr. 300-01, 303).

On November 7, 2011, Hayes complained to Dr. Rodriguez of pain in his left ankle, primarily at night. Plaintiff was taking Percocet every four to six hours as needed for pain. Physical examination was essentially normal, except that he was tender to palpation in his left ankle, with minimal swelling. X-rays showed the syndesmotic screws in place with some loosening. Dr. Rodriguez noted that the fibula fracture did not

---

[5]A trimalleolar fracture is "a fracture of the ankle through the lateral malleolus of the fibula and the medial malleolus and posterior process of the tibia." Stedmans Medical Dictionary fracture (27th ed. 2000), on Westlaw at STEDMANS 153970. A malleolus is a "rounded bony prominence such as those on either side of the ankle joint." Id. at STEDMANS 238720.

[6]Syndesmosis is a "form of fibrous joint in which opposing surfaces that are relatively far apart are united by ligaments; e.g., . . . the fibrous union between the . . . tibia and fibula." Id. at STEDMANS 397010.

[7]Percocet is a combination of oxycodone, an opioid pain reliever, and acetaminophen, a less potent pain reliever that increases the effects of oxycodone, and is used to relieve moderate to severe pain. Drugs.com (revised Mar. 19, 2014), http://www.drugs.com/percocet.html (visited Sept. 26, 2014).

appear consolidated and there was an osteochondral[8] defect in the medial talar dome[9] and calcification of the medial ankle.  Hayes did not need any medication refills.  The short leg cast was replaced.  Dr. Rodriguez told plaintiff to follow a strict non-weight-bearing regimen for three months.  (Tr. 312-13).

On November 24, 2011, Hayes was brought to the Medical Center of Louisiana New Orleans emergency department by police officers, after he reportedly brandished a weapon at his girlfriend and told her that he was seeing demons.  He was agitated and somewhat aggressive in his responses in the emergency room.  The doctor stated that plaintiff had a history of hypertension, diabetes and osteoarthritis, but that he reported no symptoms related to potential end-organ damage.  (Tr. 340-41).

Hayes was seen by a psychiatrist, Brandon Michel, M.D., at the request of the emergency room doctor.  Plaintiff told Dr. Michel that he sleeps well for seven to eight hours per night, has a normal energy level and appetite, enjoys fishing and watching television, drives more than 100 miles per hour on his motorcycle "pretty frequently" and drinks four to five beers and sips of whiskey daily.  Hayes reported taking nitroglycerin sublingual as needed for coronary artery disease, medication for hypertension, metformin and ibuprofen as needed for gout pain.  Dr. Michel diagnosed substance-induced mood

---

[8]Osteochondral means relating to, or composed of, both bone and cartilage.  Stedmans Medical Dictionary osteochondrous, at STEDMANS 288650; id. osseocartilaginous, at STEDMANS 288200.

[9]The talus is the bone of the foot that articulates with the tibia and fibula to form the ankle joint.  Id. talus, at STEDMANS 399450.

disorder versus mood disorder, not otherwise specified; rule out psychosis.  He opined that Hayes did not meet the criteria for inpatient admission as a threat to others and did not need any psychiatric medications.  (Tr. 337-39).

Hayes told Dr. Rodriguez on December 5, 2011, that he had been walking on his cast.  He complained of pain in his left ankle.  The left ankle was minimally tender to palpation and had minimal swelling.  X-rays showed that the fracture was healing, but not completely healed, and that the syndesmotic screws were in place and intact.  Dr. Rodriguez questioned whether the lateral malleolus was healing.  He recommended removal of the syndesmosis screws and intraoperative assessment of whether the lateral malleolus was healing, with the possibility of a revision[10] of the lateral malleolus.  He anticipated placing a zip loop[11] across the syndesmosis to protect it into the future.  (Tr. 325-26).

At plaintiff's first visit to Dr. Simoneaux on January 23, 2012, he was in a walking boot and awaiting surgery to remove screws from his left ankle.  He reported having

---

[10]Revision is surgery performed to replace or compensate for a failed implant or to correct undesirable sequelae (such as scars or scar tissue) of previous surgery. Medline Plus Medical Dictionary (Merriam-Webster, Inc. 2014), http://www.merriam-webster.com/medlineplus/revision (visited Sept. 29, 2014).

[11]

The ZipTight™ Fixation System for Ankle Syndesmosis is a low profile, knotless suture fixation system featuring ZipLoop™ Technology.  It provides a fixation alternative to rigid stainless steel screws for repairing ankle syndesmosis joint disruptions. . . .  The ZipTight™ Fixation System for Ankle Syndesmosis allows for micro-motion during healing which more closely mimics the patient's true joint mechanics.

Biomet, Inc., http://www.biomet.com/sportsmedicine/productdetail.cfm?category=30&product=139 (visited Oct. 6, 2014).

asthma since childhood, diabetes for five years and hypertension for many years.  He complained of osteoarthritis in both knees, worse on the right than the left.  Physical examination was normal except for nonpitting pretibial[12] edema[13] bilaterally and mild tenderness to palpitation at the joint lines in both knees, but with full range of motion. Dr. Simoneaux diagnosed poorly controlled hypertension, type 2 diabetes mellitus, asthma and osteoarthritis.  She referred him to the Tulane Medical Center Pharmacy Assistance Program to obtain medications for asthma, hypertension and osteoarthritis. (Tr. 419-21).

At his next visit to Dr. Simoneaux on February 27, 2012, Hayes reported that he had been out of medications for a month and that he used his asthma medications sporadically.  He complained of increased pain in all joints and both knees.  He said he used heat on his knees and ankles, but did not use pain medication because it did not help.  He reported that he had been in a motor vehicle accident at the end of January 2012 and had been in physical therapy for a month due to chronic lower back pain.  No medical records document either the physical therapy or chronic lower back pain. Physical examination revealed edema in both ankles and full range of motion in both

---

[12]Pretibial is relating to the anterior portion of the leg.  Stedmans Medical Dictionary pretibial, at STEDMANS 331760.

[13]Edema is accumulation of excessive watery fluid in cells or intercellular tissues.  Nonpitting edema is swelling of subcutaneous tissues that cannot be indented easily by compression.  Id. edema, at STEDMANS 124770.

knees.  Hayes had diffuse synovial thickening[14] in the fingers of both hands with limited

flexion, and was tender to palpation in both shoulders with limited abduction.  Although

he reported being out of his medications for hypertension, Dr. Simoneaux noted that he

should still have plenty.  She diagnosed poorly controlled hypertension and refilled his

medications.  She counseled Hayes about the appropriate use of his asthma medications,

and he agreed to take them as prescribed.  She noted that he had diffuse arthralgias and

had originally presented with a diagnosis of osteoarthritis, but that he had a grossly

positive rheumatoid arthritis factor in blood tests a few days earlier, and he told her today

of a family history of rheumatoid arthritis.  She referred him to a rheumatology specialist.

She prescribed Celebrex[15] and Lortab[16] for pain and prednisone.[17]  She planned to

prescribe methotrexate[18] in the future.  (Tr. 416-18).

---

[14]Synovial membrane is "the connective tissue membrane that lines the cavity of a synovial joint
and produces the synovial fluid; it lines all internal surfaces of the cavity except for the articular cartilage
of the bones."  Id. membrane, at STEDMANS 245880.

[15]Celebrex (generic name:  celecoxib) is a nonsteroidal anti-inflammatory drug used to treat
osteoarthritis, rheumatoid arthritis, ankylosing spondylitis (arthritis of the spine), and short-term pain.
PDRhealth, http://www.pdrhealth.com/drugs/celebrex (visited Oct. 3, 2014).

[16]Lortab (generic name:  hydrocodone) is a combination of acetaminophen and the opioid pain
medication hydrocodone, which is used to treat moderate to moderately severe pain.  Id.,
http://www.pdrhealth.com/drugs/lortab (visited Oct. 3, 2014).

[17]Prednisone is used to reduce swelling and improve symptoms associated with certain allergic,
skin, stomach, intestinal, blood, eye, kidney, lung, or joint disorders; rheumatoid arthritis; certain
cancers; and certain infections.  Id., http://www.pdrhealth.com/drugs/prednisone (visited Oct. 3, 2014).

[18]Methotrexate is used to treat certain cancers, rheumatoid arthritis and severe psoriasis (immune
disorder that affects the skin).  Id., http://www.pdrhealth.com/drugs/methotrexate (visited Oct. 3, 2014).

Hayes saw Dr. Simoneaux again on April 2, 2012.  He complained of headaches, difficulty falling and staying asleep, joint pain unchanged from the last visit, and his hands "locking up."  He said he had to take two Lortabs at a time to control his pain.  His physical examination was normal, except for diffuse synovial thickening in all joints of both hands.  His blood sugar was above normal at 151.  His hemoglobin A1C level of 6.2 (Tr. 413) or 6.59 (Tr. 414) was within limits indicating that his diabetes was controlled.[19] Dr. Simoneaux advised him to recheck these in three months.  Although plaintiff reported taking his medications daily, Dr. Simoneaux noted in her assessment that he had "stopped meds after 90 days, suddenly, no signs of adrenal failure."  She diagnosed poorly controlled hypertension, diabetes, asthma and rheumatoid arthritis.  Hayes was still awaiting an appointment with a rheumatologist.  (Tr. 413-15).

On May 18, 2012, plaintiff reported to Dr. Simoneaux that he had gone once to the emergency room for asthma since his last visit.  No medical records document such a visit.  He said he had been using his brother's albuterol.[20]  He said that he had both

---

[19]Normal A1C blood levels range from 4.5 to 6 percent.  "For most people who have previously diagnosed diabetes, an A1C level of 7 percent or less is a common treatment target."  MayoClinic.com (Jan. 30, 2013), http://www.mayoclinic.org/tests-procedures/a1c-test/basics/results/prc-20012585 (visited Oct. 6, 2014).

[20]Proventil HFA (generic name: albuterol) is used to prevent and treat airway narrowing associated with certain breathing problems (such as asthma) and is also used to prevent wheezing caused by exercise. PDRhealth, http://www.pdrhealth.com/drugs/proventil-hfa (visited Oct. 6, 2014).

Advair[21] and albuterol, but was taking them only as needed, rather than regularly as prescribed.  He said he had not been taking any medications because he could not afford them.  He reported feeling constantly swollen and locking up.  Dr. Simoneaux diagnosed hypertension, for which plaintiff was out of medications; diabetes with neuropathy in both his feet, which is the first time that neuropathy was diagnosed; asthma, for which she again discussed with him the appropriate use of medications; and diffuse athralgias, still awaiting appointment with rheumatology.   She referred him to the Pharmacy Assistance Program for all his prescribed medications.  (Tr. 412-13).

Hayes returned to see Dr. Simoneaux on June 15, 2012 and requested refills of his medications.  Dr. Simoneaux noted that an ophthalmological examination had revealed no retinopathy.  Hayes complained of pain and swelling in his left ankle.  He reported that he had lost his insurance and that Dr. Rodriguez, his orthopedist at Tulane, had told him to follow up at Medical Center of Louisiana New Orleans.  He stated that an orthopedist at Medical Center of Louisiana New Orleans said that they would not do anything and that Dr. Rodriguez needed to come there to perform the surgical removal of the screws in plaintiff's left ankle.  Physical examination revealed diffuse edema in all joints.  Plaintiff's left ankle had palpable hardware and no range of motion.  Dr.

---

[21]Advair HFA (generic name: salmeterol) is used to treat asthma.  It contains two medicines: fluticasone and salmeterol.  Fluticasone decreases inflammation in the lungs, while salmeterol relaxes muscles in the airways. Id., http://www.pdrhealth.com/drugs/advair-hfa (visited Oct. 6, 2014).

Simoneaux diagnosed poorly controlled hypertension, diabetes with neuropathy, asthma, rheumatoid arthritis for which she started him on Plaquenil and refilled his pain medications[22] and left ankle pain.  (Tr. 411-12).

Hayes testified that he was told that Medicaid would not pay for the additional ankle surgery.  However, there is no medical evidence that Hayes ever followed up on Dr. Rodriguez's recommendation.  Dr. Simoneaux offered on June 18, 2012, to give plaintiff a referral to the Medical Center of Louisiana New Orleans with detailed information from Dr. Rodriguez's notes to try and facilitate treatment.  According to her notes, Hayes refused on the basis that he had already been told that the Medical Center of Louisiana New Orleans would not do anything.  (Tr. 411-12).

Other objective clinical tests included x-rays of plaintiff's left knee on August 19, 2011, which revealed mild medial compartment osteoarthrosis.[23]  (Tr. 261).  X-rays of his lumbar and cervical spine the same day showed well-maintained alignment and contour with mild to moderate discogenic degenerative change at L5-S1 (Tr. 263), and mild bilateral joint hypertrophy at C3-4 and C5-6.  (Tr. 266).  No clinical tests support plaintiff's testimony that he has a ruptured disc.  On August 23, 2011, a chest x-ray and

---

[22]Plaquenil (generic name:  hydroxychloroquine) is used to treat rheumatoid arthritis symptoms, such as swelling, inflammation, stiffness and joint pain.  Id., http://www.pdrhealth.com/drugs/plaquenil (visited Sept. 24, 2014).

[23]Osteoarthritis is a synonym for osteoarthrosis.  Stedmans Medical Dictionary osteoarthrosis, at STEDMANS 288490.

an echocardiogram were normal.  (Tr. 242, 245, 250).  Echocardiograms on April 13, 2011 and November 24, 2011, showed borderline abnormalities.  (Tr. 343-44, 366-67). Plaintiff's pulmonary function tests were within normal limits on September 2, 2010, and at his visits to Dr. Simoneaux in 2012.  (Tr. 362, 412, 413, 414, 416, 421).

The ALJ accorded some weight to the opinions of plaintiff's treating sources, finding that the medical evidence was partially consistent with plaintiff's allegations, stated symptoms and functional limitations.  However, the ALJ found that plaintiff's conditions are responsive to treatment and are not disabling.

A medical condition that can reasonably be remedied by surgery, treatment or medication is not disabling.  Muckelroy v. Astrue, 277 F. App'x 510, 511-12 (5th Cir. 2008) (citing Burnside ex rel. Burnside v. Bowen, 845 F.2d 587, 592 (5th Cir. 1988), abrogated on other grounds by Sullivan v. Zebley, 493 U.S. 521, 527 (1990)); Hebert v. Barnhart, 197 F. App'x 320, 323 (5th Cir. 2006) (citing Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988)); Bolton v. Apfel, 237 F.3d 632, 2000 WL 1701816, at *1 (5th Cir. Nov. 3, 2000); Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987); Acosta v. Astrue, 865 F. Supp. 2d 767, 790 (W.D. Tex. 2012); Quintanilla v. Astrue, 619 F. Supp. 2d 306, 321 (S.D. Tex. June 27, 2008).  The ALJ found that plaintiff's medical conditions were being controlled and/or could be remedied by medication and surgery, and that Hayes had failed to follow up with Dr. Rodriguez's recommendation for left ankle surgery and

Dr. Simoneaux's offer to facilitate obtaining that surgery.  This conclusion is substantially supported by the medical records described above.

The ALJ considered the record as a whole in determining that Hayes's subjective complaints were not fully credible.  Hoelck v. Astrue, 261 F. App'x 683, 686 (5th Cir. 2008) (citing Leggett, 67 F.3d at 565; Hollis v. Bowen, 837 F.2d 1378, 1384-85 (5th Cir. 1988)).  Having done so, the ALJ's findings regarding plaintiff's residual functional capacity are substantially supported by the evidence as a whole, including the opinions of his treating physicians between December 2010 and June 2012.  These opinions are well supported by objective medical evidence and the other evidence of record.  "The ALJ found the medical evidence more persuasive than the claimant's own testimony. These are precisely the kinds of determinations that the ALJ is best positioned to make." Falco, 27 F.3d at 164.  Accordingly, this assignment of error lacks merit.

### 2.    Medical-Vocational Guideline 201.10 does not apply.

The ALJ found that Hayes has the residual functional capacity to perform light work, with the exceptions noted in his decision.  Hayes argues that, if the ALJ had properly assessed his residual functional capacity as sedentary, Rule 201.10 of the Medical-Vocational Guidelines would direct a finding of disabled. Rule 201.10 provides that a person closely approaching advanced age (age 50-54) with limited or less education, who has skilled or semiskilled work experience with nontransferable skills

and who is restricted to sedentary work, is disabled.  20 C.F.R. pt. 404, subpt. P, app. 2, § 201.10.

As discussed in the preceding section, the ALJ's residual functional capacity determination is supported by substantial evidence.  Therefore, Rule 201.10 is not applicable and the ALJ did not err by failing to use it.

## CONCLUSION

The ALJ's residual functional capacity finding is supported by substantial evidence and the ALJ properly decided not to apply Rule 201.10 of the Medical-Vocational Guidelines.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28

U.S.C. § 636(b)(1)).[24]

New Orleans, Louisiana, this _____8th_____ day of October, 2014.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[24]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.